# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAMILLE GROSDIDIER, | |
| Plaintiff, | |
| v. | Civil Action No. 08-1553 (CKK) |
| CHAIRMAN, BROADCASTING BOARD OF GOVERNORS, | |
| Defendant. | |

## MEMORANDUM OPINION
(March 28, 2011)

Plaintiff Camille Grosdidier ("Grosdidier") brings this action against the Broadcasting Board of Governors ("BBG" or the "agency") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Grosidier alleges that her employer, the Voice of America ("VOA"), an entity within the BBG, discriminated against her based on her race, age, sex, and national origin and retaliated against her for complaining about this discrimination. Presently pending before the Court are Defendant's [21] Motion for Judgment on the Pleadings or Alternatively, [15] Motion for Summary Judgment and Plaintiff's [23] Motion for Adverse Presumption. For the reasons explained below, the Court shall GRANT-IN-PART Defendant's Motion for Summary Judgment with respect to all of Plaintiff's claims except her claim that Defendant retaliated against her by reducing her editing responsibilities after October 5, 2007, with respect to which the Court shall DENY-IN-PART Defendant's motion. The Court shall also DENY Plaintiff's Motion for Adverse Presumption.

# I. BACKGROUND

Camille Grosdidier has worked as an International Broadcaster with the French to Africa Service of the Voice of America since 1987. Def.'s Stmt.[1] ¶ 2. Grosdidier is a white female of French national origin who is a naturalized citizen of the United States. *Id.* ¶ 1. She is employed at the GS-12 level. *Id.* ¶ 2. The BBG encompasses all U.S. civilian international broadcasting, including the VOA, Radio Free Europe, and other networks. *Id.* ¶ 14. BBG broadcasters distribute programming in sixty languages to an estimated weekly audience of 175 million people via radio, television, the internet, and other new media. *Id.* The VOA's French to Africa Service primarily competes with French, British, and local African radio and media services. *Id.* ¶ 15. These competitors began using television, internet, and other new communication technologies before the VOA, and the French to Africa Service has since recognized the importance of multimedia forms of communication. *Id.*

Throughout most of the time relevant to this litigation, the Chief of the French to Africa Service was Idrissa Seydou Dia ("Dia"). *See* Pl.'s Ex. 6 (Dia Dep.) at 5. Dia had been acting in that capacity since sometime in 2003. *Id.* Between 1992 and 2002, Grosdidier filed a series of equal employment opportunity ("EEO") complaints about discrimination and harassment in the

---

[1] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding that district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [11] Order at 2 (Oct. 28, 2009). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

workplace. *See* Def.'s Ex. Y (Aff. of Camille Grosdidier) at 1-2. In September 2002, Grosdidier filed a complaint about her nonselection for a GS-13 International Broadcaster position in the French to Africa Service, alleging discrimination based on her sex, color, and reprisal for engaging in EEO activity. *Id.* at 2. That complaint was dismissed by an administrative judge. *See* Pl.'s Ex. 2 (Grosdidier Dep.) at 37. Grosdidier also complained about an incident in 2000 when her supervisor, then-Chief Claude Porsella, removed her from editing duties. *See id.* at 32-33. She was eventually reinstated to editing duties. *Id.* at 33-34. Grosdidier contends that her EEO activity was generally known within the French to Africa Service. *See* Def.'s Ex. Y (Aff. of Camille Grosdidier) at 2.

  *B. Grosdidier's Complaints About Her Work Environment*

  Around 2004 and 2005, Grosdidier complained to her supervisors about what she perceived to be a sexually charged atmosphere in the French to Africa Service. Dia had a particularly friendly relationship with one female producer in the office, who called Dia "Sexy Papa" and whom Dia called "Sexy Mama." *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 109. Ferdinand Ferella, who worked as a managing editor for the French to Africa Service, described this as "something of a joke." *Id.* Dia testified that it did not have any sexual connotation, but instead resulted from Dia's mistranslation of the Jimi Hendrix song "Foxy Lady." *See* Pl.'s Ex. 6 (Dia Dep.) at 40-41. Grosdidier objected to the banter between Dia and this employee. Grosdidier also complained about another female employee who called Ferella "maître,"or "master," which she thought was inappropriate. Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 110-11; Pl.'s Ex. 2 (Grosdidier Dep.) at 190. This conduct stopped after Grosdidier complained. Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 115.

Grosdidier complained about hugging and kissing in the workplace that she perceived to be unprofessional and outside the bounds of what was acceptable in French culture.  Pl.'s Ex. 2 (Dep. of Camille Grosdidier) at 185-86.  On May 3, 2005, Grosdidier sent an email to Dia complaining about one particular female co-worker who gave a "big, long, fat hug" to a Senegalese man visiting the office; Grosdidier objected to what she perceived as the employee's "pressing need to press herself against every man in sight on the slightest pretext - especially strangers - and the way this has 'sexualized' our French Branch office."  Pl.'s Ex. 30 (5/3/2005 Email from Grosdidier to Dia) at 17.

Grosdidier also complained about an email sent around the office in April 2004 depicting a man straddling a cannon, which she perceived to be sexually suggestive.  *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 117; Pl.'s Ex. 29 at 12 (4/13/2004 Email from Grosdidier to Eric Agnero) ("Thanks for this edifying picture of a man with a giant object between his legs.").  Dia told Grosdidier that the employee who sent the email did not see anything sexual about the photograph, which depicted a famous musician from his home country.  *See* Pl.'s Ex. 29 at 13; Pl.'s Ex. 6 (Dia Dep.) at 36.  In November 2003, the same employee had sent an email around the office containing a picture of an outdoor marketplace in which brassieres were prominently displayed.  *See* Pl.'s Ex. 29 at 14.  Grosdidier also complained about one male employee who wore short shorts to the office; Ferella agreed in his deposition testimony that his attire was unprofessional.  *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 118-19.

Dia took informal action in response to Grosdidier's complaints, warning people during a morning office meeting not to go overboard with physical contact and to keep things professional because "someone" might complain.  *See* Pl.'s Ex. 6 (Dep. of Idrissa Dia) at 37-38.  Dia denies

4

identifying Grosdidier as the potential complainant. *See id.* at 132. Dia told Ferella that he was

frustrated by Grosdidier's complaints because he did not believe the conduct was sexual in

nature. *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 115-16. Dia testified in his deposition

that he was upset at Grosdidier for tarnishing his warm relationship with the employee who

called him "Sexy Papa." *See* Pl.'s Ex. 6 (Dep. of Idrissa Dia) at 41.

   C.  *Grosidier's Editing Duties & Other Work Responsibilities*

   Although Grosdidier's primary responsibilities as a broadcaster in the French to Africa

Service involved reporting and producing news stories, she was occasionally given duties editing

the work of other broadcasters. Grosdidier has produced evidence indicating that between

February 2004 and at least April 2005, she was regularly assigned editing duties. *See* Pl.'s Ex. 26

(2/6/2004 Email from Dia to French to Africa Service) at 2 (listing Grosdidier as one of two

broadcasters on the editing team under the overall supervision of a senior editor); Pl.'s Ex. 42

(assignment sheets). Editing duties were normally handled by senior editors rather than

broadcasters like Grosdidier. *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 32-33. According

to Timothee Donangmaye ("Donangmaye"), one of Grosdidier's colleagues, only a few

broadcasters who had excellent language skills were assigned to edit. *See* Pl.'s Ex. 20 (Dep. of

Timothee Donangmaye) at 33-35. Donangmaye was one of those broadcasters who performed

editing duties on a rotating basis. *Id.* at 35-36. Grosdidier's editing skills were mentioned

favorably in several performance evaluations during this period. *See* Pl.'s Ex. 40 (Performance

Appraisal Report) at 8; Pl.'s Ex. 41 (Performance Appraisal Report) at 8. When assigned editing

duties, Grosdidier would conduct the first editing review of other broadcasters' work, and the

final product would be reviewed again by other supervisors. *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 43.

Sometime in 2005, Dia made a change in the work assignments that resulted in Grosdidier working less on editing assignments. Pl.'s Ex. 34 (Dia Dep.) at 66-67, 70. It appears this change began around June 2005. *See* Pl.'s Ex. 3 (Assignment sheets). However, by April 2006, Grosdidier was being reassigned to editing duties on a rotating basis. *See* Pl.'s Ex. 34 (Dia Dep.) at 68-72; Pl.'s Ex. 27 (Assignment sheets). Records of weekly editing assignments produced by Grosdidier appear to indicate that she was assigned editing duties at least a few days each month between April and December 2006. *See* Pl.'s Ex. 27.

Another aspect of Grosdidier's duties at the VOA involved editing and uploading content on the VOA's website. According to a project manager in the BBG's Office of Internet Services, VOA employees cannot edit or upload content on the website unless they have received training in the content management system used by the VOA, which is called CommonSpot. *See* Pl.'s Ex. 22 (Decl. of Marlene Wright) ¶ 3. Since February 2006, an individual could not get a password to edit or upload news until completing three CommonSpot training classes. *Id.* ¶ 4. Grosdidier took her first training class on March 6, 2006 and completed the training requirement on March 23, 2006. *Id.* Timothee Donangmaye completed all three classes by May 2005. *Id.* In the summer of 2005, Dia sent his staff a memorandum stating that Donangmaye would be working on the internet with some other staffers, and Grosdidier assumed this meant that she should not be posting her own content on the website. *See* Pl.'s Ex. 14 (Grosdidier Dep.) at 88-90. In February 2007, Dia sent a memorandum to his supervisors requesting approval for Grosdidier to edit the VOA website. *See* Pl.'s Ex. 45 (2/12/2007 Memorandum).

D.       *Vacancy for a GS-13 International Broadcaster Position*

In February 2006, BBG posted a vacancy announcement for an International Broadcaster, GS-13 position in the French to Africa Service. Def.'s Stmt. ¶ 16. There is some evidence in the record that Dia was aware that the vacancy would be filled as early as June 1, 2005. *See* Pl.'s Ex. 43 (6/1/2005 Email from Grosdidier to French to Africa Service).

The vacancy announcement stated that applicants should have the following knowledge, skills, and abilities ("KSAs"):

> (1) Proven ability to write balanced, objective radio, television and Internet scripts on news events and feature topics that appeal to, educate, explain, and provide context to international audiences;

> (2) Broad knowledge of the principles, practices, and procedures of journalistic writing and editing and editing for radio, TV and Internet.

> (3) Knowledge of world affairs and U.S. foreign policy, as well as contemporary political, economic, cultural, and social developments and trends in the U.S.

> (4) Skill in establishing and maintaining effective and respectful working relationships with team members, colleagues in multi-media elements of VOA, and groups of individuals providing information or interviews for programs or program segments.

> (5) Demonstrated experience in writing/editing for a foreign audience.

> (6) Knowledge of international radio broadcast, TV and Internet techniques and practices.

Def.'s Stmt. ¶ 18. A separate position description document described the major duties for the position to include "[p]lans and coordinates, as Webmaster, content of Website that includes news and feature material" and indicated that the incumbent "is a host of our weekly TV program." *See* Pl.'s Ex. 52 (Position Description) at 6; Def.'s Ex. C (Position Description) at 2. The position description was initially drafted by an employee in the BBG's human resources

office, but the language regarding the webmaster duty and hosting the weekly TV program was added at Dia's request. *See* Def.'s Stmt. ¶ 17; Pl.'s Ex. 6 (Dia Dep.) at 165-67. Dia testified that it was quite clear that whoever was selected for the position would be hosting the TV show and managing the website. *See* Pl.'s Ex. 6 (Dia Dep.) at 61-62. The position was informally described as "multi-media Senior Editor." *See* Def.'s Ex. M. At the time the vacancy was announced, Donangmaye was hosting the French to Africa Service's weekly "Washington Forum" program and was one of the people responsible for updating content on its website. *See* Pl.'s Ex. 20 (Donangmaye Dep.) at 36-38, 43. Dia testified that the reason the Service was hiring a GS-13 level broadcaster was because of the combined television hosting and internet duties. *See* Pl.'s Ex. 6 (Dia Dep.) at 60-62. However, Donangmaye had been performing these duties as a GS-12 level employee, and another employee who worked on the internet was employed at the GS-9 level. *See id.* at 46; Pl.'s Ex. 46 (BBG/IBB Staffing Pattern). Ferdinand Ferella explained that hosting duties are not dependent on grade level. *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 106.

Dia selected a panel of three individuals to conduct the interviews of the candidates and make a recommendation to him. Def.'s Stmt. ¶ 19. Dia was the selecting official, and he had stated publicly that he would follow the recommendation of the panel in making his selection for the position. *Id.* The three panelists were Andre de Nesnera ("de Nesnera"), Sandra Lemaire ("Lemaire"), and Dianne Butts ("Butts"). *Id.* ¶ 20. All three were qualified to serve on the panel. *Id.* De Nesnera is a white male of French national origin; Lemaire is a black female of Haitian national origin; and Butts is an African-American female. *Id.* ¶¶ 21-23. The panelists received the vacancy announcement and the candidates' application packets from Dia. *Id.* ¶ 24. The

8

parties disagree about the extent to which Dia provided the panelists with additional information about the candidates or the position. According to de Nesnera, Dia told the panel about the responsibilities that would be associated with the job, but he did not provide any introductory remarks for each candidate and he did not tell the panelists what he was looking for in the candidates beyond the simple job description. *See* Pl.'s Ex. 9 (De Nesnera Aff.); Def.'s Ex. F (De Nesnera Dep.) at 17-19. According to Lemaire, Dia gave only a brief description of the job as it was explained in the vacancy announcement and basic introductory information about each candidate, such as where the candidate was from. *See* Pl.'s Ex. 7 (Lemaire Dep.) at 26-32; Pl.'s Ex. 8 (Lemaire Aff.) ¶ 4.

The panelists interviewed six candidates for the position on March 7, 2007. Def.'s Stmt. ¶ 25. The candidates to be interviewed included Grosdidier, Donangmaye, and four candidates from outside the VOA. The panel unanimously recommended that Donangmaye be selected for the position. *Id.* Donangmaye is a black male of Chadian national origin. *Id.* The panel drafted a memorandum explaining their choice of Donangmaye based on his qualifications. *See* Def.'s Ex. M. The memorandum explained that the panel was impressed by Donangmaye's experience in "all three facets of the multi-media structure," i.e., radio, television, and internet. *See id.* The memorandum further stated that the panel was impressed by Donangmaye's leadership qualities and felt that Donangmaye understood the challenges facing the French to Africa Service. *Id.* The memorandum did not compare Donangmaye to any of the other candidates. *See id.* The record suggests that sometime after the panel drafted this memorandum, Dia informed them that they needed to include a score for each candidate along with the panel's recommendation. *See* Pl.'s Ex. 10 at 4-5. Dia told them to rate the applicants on a scale of 1 to 100. *See id.* at 6. The

panelists did not have a scoring sheet or a list of factors with which to assign a score; rather, the panel assigned scores based on the panelists' recollection of the candidates' qualifications and performances during their interviews. *See* Pl.'s Ex. 7 (Lemaire Dep.) at 53-55; Pl.'s Ex. 12 (De Nesnera Dep.) at 24-25. The panel assigned a score of 90 points for Donangmaye, 80 points for Grosdidier, and 85 points for the panel's second-choice candidate, Rachid Jaafar ("Jaafar"); the other candidates were scored lower than Grosdidier. *See* Def.'s Ex. M; Pl.'s Ex. 12 (De Nesnera Dep.) at 26.

Lemaire testified that she perceived from Grosdidier's interview that there were people in the agency she did not get along with, suggesting she might conflict with management. *See* Pl.'s Ex. 7 (Lemaire Dep.) at 59-61. She testified that she thought Rachid Jaafar was a better candidate because he did not have these problems, explaining, "The difference between Ra[c]hid [Jaafar] and Camille [Grosdidier] was that Ra[c]hid had been an insider–was now on the outside and was coming back more neutral, so he really had no axe to grind with anyone." *Id.* at 59. Lemaire got the impression that Grosdidier "wasn't a total cheerleader for the agency and for management." *Id.* at 61. Grosdidier contends that she did not say anything during her interview that would suggest she had any problems with management, but the only record evidence in support of this contention is the fact that Butts's notes from the interview do not indicate any such statements. *See* Pl.'s Resp. Stmt. ¶ 72(d).[2] Grosdidier testified that the interview was "disorganized," and she felt that some of the questioning was aggressive. Pl.'s Ex. 14

---

[2] Grosdidier also cites her own deposition testimony in which she described what she said during the interview, but she does not explicitly claim that she did not say anything that the panelists could have construed as critical of management. *See* Pl.'s Stmt. ¶ 72(e); Pl.'s Ex. 14 (Grosdidier Dep.) at 76-78.

(Grosdidier Dep.) at 74-75. According to Grosdidier, de Nesnera asked her, "Tell us why we shouldn't go with an outsider? Tell us why you would be better." *Id.* at 74. Grosdidier claims that she answered, "If you do find an outsider who's best qualified, why not?" *Id.* Butts testified that she did not recall Grosdidier being asked this question, but instead she recalled Grosdidier volunteering something like, "fresh blood for this job might be good rather than me." *See* Pl.'s Ex. 11 (Butts Dep.) at 60-61. Butts thought Grosdidier's response was odd and suggested she did not really want the job. *Id.* at 61. De Nesnera perceived Grosdidier's comments as suggesting that she was less qualified to lead her coworkers. *See* Pl.'s Ex. 12 (De Nesnera Dep.) at 29. Butts also testified that none of the candidates were asked whether an insider or outsider would be better, but her notes from the interview with Donangmaye include the phrase "Insider better why?" with a summary of Donangmaye's explanation as to why he thought an insider was better. *See* Pl.'s Ex. 11 (Butts Dep.) at 59-60; Pl.'s Ex. 16 (Butts interview notes). Grosdidier also contends that de Nesnera asked her in a forceful voice about her leadership experience, claiming that the GS-13 position was supervisory, despite the fact that there was nothing about supervisory responsibilities in the job description. *See* Pl.'s Ex. 14 (Grosdidier Dep.) at 71-72.

There is some conflicting evidence in the record about what factors were most important to the panelists in choosing Donangmaye as their top candidate. Lemaire testified that supervisory experience was an important factor, and this is also reflected in Butts's notes. *See* Pl.'s Ex. 8 (Lemaire Aff.) ¶¶ 22-23; Pl.'s Ex. 16 (Butts interview notes) at 1. However, de Nesnera testified that supervisory experience was not a factor that was seriously considered or discussed. *See* Pl.'s Ex. 12 (De Nesnera Dep.) at 42-43. Both Lemaire and de Nesnera testified that internet skills were a deciding factor that set Donangmaye apart from Grosdidier. *See id.* at

20-21; Pl.'s Ex. 7 (Lemaire Dep.) at 72-73 ("With regards to being the best person for the job, we thought Timothee, because he had worked on the French to Africa website. But knowledge of the internet, I think, from what I recall, Ra[c]hid and Timothee were comparable and Camille, les[s]."). However, Butts did not recall internet experience being a main factor in the decision. *See* Pl.'s Ex. 11 (Butts Dep.) at 71. Defendant states in answers to interrogatories that Lemaire and de Nesnera also took some notes during the interviews but discarded them afterwards. *See* Pl.'s Ex. 13 (BBG Discovery Responses) at 7. However, Lemaire claims in an affidavit that she did not take any notes. *See* Def.'s Ex. EE (Lemaire Aff.) at 44.

Grosdidier claims that Dia selected panelists who would accede to his preference for Donangmaye and disfavor Grosdidier in the selection process. De Nesnera was a regular guest on the Washington Forum television program that Donangmaye hosted, and he testified at deposition that "you can't find a better person" than Donangmaye to be the host of that program. *See* Pl.'s Ex. 12 (De Nesnera Dep.) at 8. Butts was the executive producer of the Washington Forum program, and she had selected Donangmaye for the hosting job after an audition. *See* Pl.'s Ex. 11 (Butts Dep.) at 6. Dia had also consulted with Butts, another Service Chief, about one of Grosdidier's altercations with another female employee who also worked with Butts. *Id.* at 12-13. Butts testified that Dia had talked to her generally about Grosdidier's complaints, and Butts believed that Grosdidier was not happy in the Service. *Id.* at 14-15. However, Butts testified that she did not talk to Dia about the selection process for the vacant position. *Id.* at 13. Lemaire indicated in her deposition that Dia selected her because of her experience in broadcasting, the internet, the French language, and African affairs. *See* Pl.'s Ex. 7 (Lemaire Dep.) at 25. Lemaire was friendly with Dia, but she was not his first choice for the panel. *See id.*

12

at 13; Pl.'s Ex. 6 (Dia Dep.) at 58-59. Lemaire testified that she was aware that there was "in-fighting" within that branch of the VOA, which she felt was common knowledge to those in the agency. Pl.'s Ex. 7 (Lemaire Dep.) at 59. De Nesnera testified, however, that he was not aware of any friction in the office. *See* Pl.'s Ex. 12 (De Nesnera Dep.) at 29-30.

Grosdidier also claims that Dia did not provide the panelists sufficient time to review the candidates' written qualifications because Grosdidier's written qualifications were superior. There is conflicting evidence in the record regarding the extent to which the panelists relied on the candidates' written qualifications. According to Lemaire, the panelists were provided a copy of the written application materials shortly before each interview, and she did not believe that they kept the materials for their deliberations after the interviews. *See* Pl.'s Ex. 7 (Dep. of Sandra Lemaire) at 27, 32-33, 53. Butts and de Nesnera both testified that they had the candidates' written materials at the time of the deliberations. *See* Pl.'s Ex. 12 (Dep. of Andre de Nesnera) at 17; Pl.'s Ex. 11 (Dep. of Diane Butts) at 36-37. Lemaire testified that the panel's assessment was based primarily on their overall assessment of the candidates and their interviews. *Id.* at 53-54.

As part of her application, Grosdidier submitted a resume and a two-page statement setting forth her KSAs. *See* Pl.'s Ex. 23 (Grosdidier application materials). Grosdidier's resume described her experience as a broadcaster with the French to Africa Service since 1987, which included experience as substitute host of "Washington Forum." *See id.* at 4. Grosdidier explained that she had over twenty years of experience in the French to Africa Service and that she had been responsible for producing a weekly fifteen-minute economic news magazine program as well as a daily program covering events relating to the United States. *See id.* at 6.

13

Grosdidier also highlighted her international travel and cultural experiences. *See id.* at 6-7. With respect to internet skills, Grosdidier stated in her KSAs statement that two of her colleagues had been responsible for managing content on the internet but that she had familiarized herself with the internet and was taking classes to become certified to assist with the internet duties. *See id.* at 7. Grosdidier also included a performance appraisal report in which Dia rated her achievement as "highly successful." *See id.* at 9-19. Grosdidier's educational background includes a masters degree in international affairs. *See id.* at 5.

Donangmaye's application packet described his experience as a broadcaster in the French to Africa Service since 1998 as well as his prior experience as a reporter for the Chadian government's news agency. *See* Pl.'s Ex. 38 (Donangmaye application materials) at 1-2. Donangmaye also earned a masters degree in media analysis and management as a Fulbright Scholar at Virginia Commonwealth University. *See id.* at 2. Donangmaye highlighted his experience with internet technology in his application, noting that he was only one of two people within the French to Africa Service who could edit the website. *Id.* In his statement setting forth his KSAs, Donangmaye highlighted his writing and editing experience with the VOA and his experience as the host of "Washington Forum." *See id.* at 3. At the time of the interview and selection, Donangmaye was not a U.S. citizen.

Rachid Jaafar was working as the Washington senior correspondent for the Al-Jazeera broadcast network at the time he interviewed for the position of multi-media Senior Editor. *See* Def.'s Ex. AA (Jaafar application materials). Jaafar also worked as a broadcast journalist and news editor for VOA between 1984 and 2002, working primarily in the Arabic language. *See id.* at 1-2. Jaafar is also fluent in French and his resume reflected experience translating between

French, English, and Arabic. *See id.* He earned a masters degree in international public policy in 2002. *Id.* at 1. In his KSA statement, he emphasized his experience as a reporter, his experience establishing and maintaining work relationships, and his familiarity with African issues. *See id.* at 3-4. Jaafar was a U.S. citizen at the time of the interview and selection. *See* Def.'s Stmt. ¶ 35.

Dia accepted the panel's recommendation of Donangmaye. On March 8, 2006, the day after the panel conducted its interviews and made its recommendation, Dia wrote to his supervisor explaining why Donangmaye should be selected for the position over Jaafar and Grosdidier, who were U.S. citizens. *See* Def.'s Ex. N (3/8/2006 Letter from Dia to Gwen Dillard). Dia wrote that he agreed with the panel that Donangmaye was the most qualified candidate for the job. *See id.* Dia praised Donangmaye's command of the French language, his experience as a newswire writer (which Dia believed made Dia particularly qualified to edit the website), his knowledge of African issues, and his positive workplace relationships. *See id.* On March 22, 2006, Dia wrote a memorandum to the Chief of the agency's Operations Division explaining why Donangmaye should be selected for the position over the other qualified U.S. citizens. *See* Def.'s Ex. N (3/22/2006 Memorandum from Dia to LaPrell Murphy). He wrote that Donangmaye had been selected for the GS-13 multi-media Senior Editor position and praised his qualifications. *See id.* Dia distinguished the experience of Jaafar as more relevant to the Arab world than to sub-Saharan Africa, which is targeted by the French to Africa Service. *See id.* Dia stated that Grosdidier had a better knowledge of sub-Saharan Africa than Jaafar but that it was not as extensive as Donangmaye's. *Id.* Dia also noted that Grosdidier had not completed the CommonSpot training for the website. *Id.* Dia also stated that based on his knowledge of Grosdidier's and Donangmaye's respective strengths and weaknesses in the French

language and African issues, as well as their interactions with colleagues in the Service, he was confident that Donangmaye was the best candidate for the position. *Id.*

### E.    *Grosdidier's EEO Complaint Regarding Her Nonselection*

Grosdidier was notified of her nonselection for the promotion on April 3, 2006. *See* Answer ¶ 5(a)(i). On July 5, 2006, she timely filed a formal complaint alleging that she was not selected because of her sex, race, national origin, and her prior EEO activity. Compl. ¶ 5(a)(i)-(ii). In proceedings before the Equal Employment Opportunity Commission ("EEOC"), Grosdidier conducted discovery and took numerous depositions. *Id.* ¶ 5(a)(iii). She deposed Dia on February 2, 2007. *See* Pl.'s Ex. 6 (Dia Dep.). The EEOC did not grant Grosdidier the relief she requested.

### F.    *Additional Acts of Alleged Discrimination*

Grosdidier claims that after she complained about her nonselection, Dia failed to take appropriate steps to ensure that Grosdidier's position description was updated to reflect the duties of "International Broadcaster" as opposed to "International Radio Broadcaster," leaving her position vulnerable in the face of a potential reduction in force action. *See* Compl. ¶ 27; Pl.'s Ex. 2 (Grosdidier Dep.) at 39-40. The record shows that Dia submitted updated position descriptions to the agency's Office of Human Resources for all of his employees in March or April 2007. *See* Def.'s Ex. P (Aff. of Carroll Cobb) at 4. Grosdidier disputes this but cites no contrary evidence in the record. *See* Pl.'s Resp. Stmt. ¶¶ 54-55.

According to Grosdidier, Dia removed her from participating as a contributor or host on "Washington Forum" in the fall of 2006. *See* Pl.'s Ex. 58 (Grosdidier Aff.) at 6. Grosdidier also claims that shortly after Dia was deposed as part of the EEOC litigation in February 2007, she

was again removed from editing duties on a rotational basis. *See* Pl.'s Opp'n at 41; Pl.'s Resp.

Stmt. ¶ 59.[3]  Grosdidier has produced records of weekly editing assignments from 2007 that

appear to indicate that Grosdidier was assigned editing responsibilities during one week in late

January/early February 2007 (two days), one week in late February (one day), one week in late

March (four days), one week in early May (five days), and no times throughout the rest of 2007.

*See* Pl.'s Ex. 28 (2007 assignment sheets).[4]  It appears that when Grosdidier was not assigned

editing duties, first-level editing was handled by either Henry Francisque, a GS-13 Senior Editor,

Jean Claude Andre, another GS-12 broadcaster, or Donangmaye, now promoted to the GS-13

Senior Editor position. *See id.*  Dia testified that Grosdidier had never had regular editing duties

and that her assignments were always made on an ad hoc basis. *See* Pl.'s Ex. 6 (Dia Dep.) at 13-

20.  Ferdinand Ferella testified at his deposition in March 2009 that the primary editing

assignments had not changed since 2004 when Grosdidier was initially assigned to be a part of

the editing team. *See* Pl.'s Ex. 24 (Dep. of Ferdinand Ferella) at 58-60, 147.

Grosdidier also claims that Dia stopped speaking to her after she filed her complaint

regarding her nonselection for the position.  However, the only evidence she cites in support of

this claim is an affidavit from one of her coworkers, Samuel Kiendrebeogo, who stated that Dia

once asked him to relay a message to her regarding a trip she was scheduled to take to Mexico.

---

[3] The Court notes that Grosdidier's testimony about her reduction in editing responsibilities has been inconsistent.  For example, in one of her affidavits, she claims that was removed from editing on a regular basis in June 2007.  *See* Pl.'s Ex. 58 at 7.  In her opposition brief, she claims it started in February 2007.  *See* Pl.'s Opp'n at 41.

[4] Although Grosdidier does not explain these records directly, they were discussed and explained by Ferdinand Ferella in his deposition.  *See* Pl.'s Ex. 24 at 40-46.

*See* Pl.'s Ex. 33 (Aff. of Samuel Kiendrebeogo) at 5.[5]  Kiendrebeogo also states that Grosdidier

told him that she was tired of having intermediaries relay messages from Dia, but this statement

is hearsay and may not be considered by the Court as part of the record at summary judgment.

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

On April 1, 2008, Grosdidier received a letter of admonition from Dia for turning off

shared office printer that was being used by another employee.  Def.'s Ex. Q (4/1/2008 Letter

from Dia to Grosdidier).  The letter stated that Grosdidier's conduct was disruptive to the

efficiency of the office and inconsiderate to coworkers.  *See id.*

G.      *Grosdidier's Second EEO Complaint*

Grosdidier contacted an EEO counselor on November 20, 2007 to complain about further

discrimination.  Def.'s Stmt. ¶ 3.  On December 27, 2007, Grosdidier filed a formal complaint of

discrimination with the BBG.  *See* Def.'s Ex. W (Formal Complaint of Discrimination).  In her

formal complaint, Grosdidier claimed that she had been discriminated against on the basis of her

sex, national origin, and engaging in prior EEO activity in 2000, 2001, and 2006.  *See id.*  She

claimed that the dates of the alleged discriminatory acts were November 20, 2007 and from

January 2007 to the present (i.e., December 27, 2007).  *Id.*  Grosdidier complained about the fact

that her position description had not been updated, reduced professional responsibilities, and her

---

[5] The Court notes that Grosdidier may have provided evidence to support this claim in her affidavits during the EEOC litigation, many of which she has attached to her opposition brief. However, she has not cited this evidence in either her opposition brief or her statement of material facts, and therefore the Court need not consider it.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); LCvR 7(h)(1) ("An opposition to . . . a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth *all material facts* as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied upon to support the statement.") (emphasis added).

supervisor's refusal to directly interact with her. *Id.* On January 9, 2008, the agency sent

Grosdidier a letter indicating that the following claims had been accepted for processing:

> Whether you were subjected to a hostile work environment and discriminated against due to your Sex (female), National Origin (French) and Reprisal (engaging in prior protected EEO activity) when the following acts occurred:
>
> 1. On or about November 20, 2007, your supervisor refused to update your position description while updating those of your colleagues.
>
> 2. Your supervisor has reduced your professional responsibilities by decreasing your editing assignments, television air time, supervisory duties and rotational assignments; and
>
> 3. Since February 2007, your supervisor has refused to interact directly with you; instead he uses your colleagues or email to communicate with you.

Def.'s Ex. R at 1. On April 2, 2008, Grosdidier's attorney contacted the agency to amend her

complaint to add a claim for:

> an ongoing pattern of behavior, aimed at Ms. Grosdidier because of her gender, age, national origin, and protected EEO activity and including, in addition to the allegations already included in the complaint, her Branch Chief's (unjustifiable and disparate) direct and indirect criticisms of work performance, and his formal and informal disciplinary actions against her including, most recently, the issuance of a letter of admonition on April 1, 2008.

*See* Pl.'s Ex. 1 (4/2/08 Letter from Leslie D. Alderman III to Delia Johnson, Int'l Broadcasting

Bureau). The agency responded on May 12, 2008, indicating that Grosdidier's complaint had

been amended to include her allegation that her sex, age, national origin, and prior EEO activity

were factors in her receiving a letter of admonition on April 1, 2008. *See* Pl.'s Ex. 1 (5/12/08

Letter from Delia Johnson to Leslie D. Alderman III).

## II. LEGAL STANDARD

Defendant has filed a motion for judgment on the pleadings or alternatively, a motion for summary judgment. Pursuant to Federal Rule of Civil Procedure 12(d), if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Because the parties have engaged in discovery and presented evidence outside the pleadings for the Court's consideration, the Court shall treat Defendant's motion solely as a motion for summary judgment.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are

susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### III. DISCUSSION

In her Complaint, Grosdidier asserts causes of action for discrimination based on her race, national origin, sex, age, and prior EEO activity. Grosidier's specific claims are based on: (1) her nonselection for the GS-13 International Broadcaster position in March 2006; (2) the reduction in her editing duties and other responsibilities, including removal as substitute host of "Washington Forum"; (3) the failure to update her job description to reflect the duties of International Broadcaster; (4) her supervisor's cessation of direct interaction with her; (5) the letter of

21

admonition issued to her in April 2008; and (6) the vocal and demeaning criticism Grosdidier received of her work performance and interaction with coworkers. Based on these actions, Grosdidier asserts claims for discrimination, retaliation, and hostile work environment.

In its motion for summary judgment, Defendant contends that Grosdidier has failed to exhaust many of her claims, that she has not suffered any adverse employment action, and that she has not produced evidence sufficient for a reasonable jury to conclude that she was the victim of discrimination, retaliation, or a hostile work environment. Grosdidier concedes that she did not exhaust her age discrimination claims and has withdrawn any claims for violations of the ADEA. *See* Pl.'s Resp. Stmt. ¶ 12; Pl.'s Opp'n at 1. Accordingly, the Court shall grant Defendant's motion for summary judgment with respect to Grosdidier's ADEA claims. Grosdidier disputes Defendant's other contentions and has filed a motion for an adverse inference based on the destruction of certain evidence relating to her interview for the GS-13 International Broadcaster position. The Court shall address the parties' arguments below.

A.    *Exhaustion of Administrative Remedies*

Before filing suit under Title VII, federal employees must timely exhaust their administrative remedies. *See* 42 U.S.C. § 2000e-16(c); *Harris v. Gonzales*, 488 F.3d 442, 443 (D.C. Cir. 2007). Under the broad authority conferred by Congress, the EEOC "has established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The administrative time limits created by the EEOC function like statutes of limitations with which complainants must comply. *Id.* Of particular significance in this case is

the requirement that "[a]n aggrieved person . . . initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); 488 F.3d at 443. "[A] court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling." *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008). Any civil action that follows a charge of discrimination "is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 479, 500 (7th Cir. 1994)); *see also Na'im v. Rice*, 577 F. Supp. 2d 361, 369-70, 372 (D.D.C. 2008). "At a minimum, the Title VII claims must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Park*, 71 F.3d at 907. Defendant bears the burden of proving by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Nai'm v. Rice*, 577 F. Supp. 2d at 370 (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)).

### 1. Claims of Discrimination Based on Race

In her Complaint, Grosdidier asserts causes of action for discrimination based on race with respect to each alleged adverse employment action. *See* Compl. ¶ 32. However, she did not list race as a basis for her claims on her December 2007 EEO complaint, on which she relies for all of her claims save her nonselection claim. Grosdidier does not dispute this, and she does not argue in her opposition brief that her claim of race discrimination was "like or reasonably related" to her claims of sex, national origin, or reprisal discrimination. *See* Pl.'s Resp. Stmt. ¶ 11; Pl.'s Opp'n at 34-35. Accordingly, the Court shall grant Defendant's motion for summary

judgment with respect to Grosdidier's claims for discrimination based on race relating to actions other than her nonselection for a GS-13 International Broadcaster position.

2.    Claim Based on Reduction of Duties

Grosdidier asserts causes of action for discrimination and retaliation based on the alleged reduction in her editing responsibilities and other work duties. Grosdidier contacted an EEO counselor about her reduction in duties in November 2007, but Defendant contends that this was untimely because it was not within 45 days of the alleged reduction in duties. The record clearly shows that many of Grosdidier's complaints about reduced responsibilities pertain to events that occurred more than 45 before she contacted an EEO counselor in November 2007. *See, e.g.*, Pl.'s Resp. Stmt. ¶ 9 ("Plaintiff's editing duties were reduced dramatically in the latter part of 2005."); Pl.'s Opp'n at 41 ("[Dia] removed Ms. Grosdidier from participating as a contributor or host on Washington Forum in the fall of 2006."). Therefore, her complaint in November 2007 was untimely with respect to these actions. Grosdidier does not identify in her opposition brief any specific reduction in duties that occurred during the 45-day time period preceding her EEO counseling. However, she does claim that her editing responsibilities were reduced from February 2007 onward, and therefore she has claimed that her editing duties were reduced during and after the 45-day period preceding her EEO counseling, which began on October 5, 2007. The record indicates that assignments were made on a weekly basis. To the extent that Grosdidier purports to assert claims based on weekly assignments after October 5, 2007, they have been timely exhausted. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007) ("[I]f an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed."). However, the

Court shall grant Defendant's motion for summary judgment with respect to Grosdidier's claims for discrimination and retaliation based on any reduction in her workplace responsibilities that occurred more than 45 days before she initiated EEO counseling.

### 3. Claim Based on Cessation of Direct Interaction with Her Supervisor

Grosdidier also asserts causes of action for discrimination and retaliation based on her supervisor's alleged cessation of direct interaction with her. Grosdidier complained about this conduct to an EEO counselor in November 2007, and the only evidence in the record relating to this claim is a single incident in which Dia asked one of Grosdidier's coworker's to pass along a message to her. The record does not clearly indicate when this occurred, and therefore Defendant has failed to establish that Grosdidier did not timely exhaust this claim.

### 4. Claim Based on Hostile Work Environment

In her Complaint, Grosdidier asserts a claim for hostile work environment based on her employer's ongoing conduct. Grosdidier exhausted a hostile work environment claim, as demonstrated by the fact that the agency investigated whether she was subjected to a hostile work environment when her supervisor failed to update her position description, reduced her professional responsibilities, refused to interact directly with her, and issued her a letter of admonition. Even though Grosdidier did not explicitly allege a hostile work environment in her formal complaint, "[a] plaintiff may adequately exhaust administrative remedies without specifically alleging a hostile work environment claim in her formal EEO complaint so long as the hostile work environment claim is 'like or reasonably related to the allegations . . . [in the formal EEO complaint] and grows out of such allegations.'" *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C. 2008) (quoting *Robertson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005)).

Therefore, to the extent that Grosdidier's complaint is based on the allegations in her formal complaint, she has exhausted her claim.

However, Defendant contends that Grosdidier is trying to expand her hostile work environment claim to include actions such as an alleged "sexually charged atmosphere" in 2005 and other events that were not described in Grosdidier's December 2007 complaint. Grosdidier argues that the Court should consider acts dating back to 2005, relying heavily on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), in which the Supreme Court held that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability." 536 U.S. at 117. However, the *Morgan* Court was focused only on Title VII's statute of limitations. *Id.*; *see* 42 U.S.C. § 2000e-5(e)(1) (requiring Title VII plaintiffs to file a charge with the EEOC within either 180 or 300 days "after the alleged unlawful employment practice occurred"). The *Morgan* Court did not explicitly address the parallel requirement that a plaintiff administratively exhaust her claims by presenting them to the EEOC or, in the case of a federal employee, the federal agency. "To satisfy the exhaustion requirement, the allegations in an administrative complaint must be sufficiently specific in order to 'give federal agencies an opportunity to handle matters internally whenever possible.'" *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 5 (D.D.C. 2008) (quoting *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985)), *appeal dismissed*, 2010 WL 1632715 (D.C. Cir. 2010). "At a minimum, the Title VII claims must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Park*, 71 F.3d at 907.

Although Grosdidier did present a claim for hostile work environment to the agency, the record shows that her claim was much more limited in scope than the claim she is asserting in federal court. Grosdidier's formal administrative complaint, as subsequently amended, described only four sets of adverse actions: (1) failure to update Grosdidier's position description; (2) reduction in Grosdidier's responsibilities; (3) cessation of direct interaction from Grosdidier's supervisor; and (4) a letter of admonition. Grosdidier's formal complaint listed the dates of discriminatory conduct as extending from January 2007 to the present, meaning that the agency would not have had a basis to investigate Grosdidier's claims about a "sexually charged atmosphere" or other discrete acts that occurred before January 2007. While *Morgan* recognizes that a hostile work environment constitutes a single adverse employment action that occurs over a period of time, Grosdidier's December 2007 complaint, as amended, was not sufficiently specific to make the agency aware that she was claiming the existence of a hostile work environment as far back as 2005. Indeed, if Grosdidier had believed that her work environment was hostile in 2005, she presumably would have raised this issue in the formal complaint she filed in July 2006. Therefore, the Court finds that Grosdidier has failed to exhaust her hostile work environment claim to the extent that it relies on allegations that are not "like or reasonably related to" those she raised in her formal complaint with the agency. Accordingly, the Court shall not consider unrelated allegations in determining whether Grosdidier has established a hostile work environment claim.

B. *Grosdidier's Nonselection Claim*

Grosdidier contends that her nonselection for the GS-13 International Broadcaster position was the result of discrimination based on her race, national origin, and sex and

retaliation for her engaging in prior EEO activity.  Defendant denies these allegations, arguing that Grosdidier was not selected for the position because she was not the most qualified candidate.  Defendant argues that Grosdidier has failed to show that its legitimate explanation is pretext for discrimination or retaliation and that Grosdidier has failed to produce evidence sufficient for a jury to conclude that there was a causal connection between her nonselection and her sex, race, national origin, or protected EEO activity.  Defendant also contends that Grosdidier's complaints about her work environment in 2005 do not constitute protected activity and therefore cannot provide the basis for a retaliation claim under Title VII.  The Court shall review the parties' contentions below.

1.  <u>Discrimination and Retaliation Claims Under Title VII</u>

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII also contains an antiretaliation provision that makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.* § 2000e-3(a).  In the absence of direct evidence of discrimination or retaliation, Title VII claims are assessed pursuant to a burden-shifting framework initially set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie

case of discrimination or retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Then, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [adverse employment action].'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."). In reviewing a motion for summary judgment, the court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d at 677 (internal quotation marks omitted); *accord Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) ("[T]he focus of proceedings at trial (and summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such

as evidence of a strong track record in equal opportunity employment).").  A plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will not always be deemed to have presented enough evidence to survive summary judgment.  *Aka*, 156 F.3d at 1289.  However, evidence of pretext usually will be enough to get a plaintiff's claim to a jury.  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (citing *Jones v. Bernanke*, 557 F.3d 670, 678-79 (D.C. Cir. 2009)).

In a case involving nonselection for a promotion, a Title VII plaintiff may meet her burden "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  "When an employer says it made a hiring decision based on the relative qualification of the candidates, 'we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.'" *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting *Aka*, 156 F.3d at 1294).  "In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination."  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *see Aka*, 156 F.3d at 1294 (holding that factfinder may infer discrimination where a reasonable employer would have found the plaintiff to be "significantly better qualified for the job").  A plaintiff attacking a qualifications-based explanation may also "seek to expose other flaws in the employer's explanation" by, for example, demonstrating that the employer's explanation was fabricated after the decision was made or that the employer's explanation actually misstates the candidates' qualifications.  *Aka*, 156 F.3d at 1295.

## 2. Evidence Supporting Grosdidier's Claims

In her opposition brief, Grosdidier identifies a number of discrete categories of evidence supporting her claim that her nonselection for the GS-13 International Broadcaster position was discriminatory and/or retaliatory. Grosdidier's evidence generally supports her theory that the selecting official, Idrissa Dia, preselected Timothee Donangmaye for the position and structured the promotion process in a way that ensured that Donangmaye would be selected over Grosdidier. Such preselection does not violate Title VII if is based on the qualifications of the candidate and not discrimination against a protected classification. *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008), *aff'd sub nom. Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009). However, Grosdidier contends that the evidence shows that the selection process was poisoned by discriminatory and/or retaliatory animus. The Court shall review each of Grosdidier's contentions below.

### a. Evidence that Dia Bore Discriminatory and Retaliatory Animus Toward Grosdidier

Grosdidier claims that Dia bore discriminatory and retaliatory animus against her based on her complaints about what she perceived to be a sexually charged workplace environment. There is evidence in the record that Dia was upset at Grosdidier for making complaints about his use of term "Sexy Mama" with a female employee, and this evidence could support a finding that Dia harbored some retaliatory animus against her. However, the evidence in the record cited by Grosdidier would not support a finding that Dia bore any discriminatory animus based on Grosdidier's sex, race, or national origin. Although Grosdidier had complained about what she perceived to be sexually suggestive language or conduct in the workplace, none of the comments

or conduct were directed at Grosdidier or clearly sexist.  *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.").  Furthermore, Grosdidier has presented absolutely no evidence of bias based on race or national origin in her workplace.  Therefore, the record at most supports a finding that Dia bore retaliatory animus against Grosdidier based on her complaints about a sexually charged workplace.

> b.  Evidence that Dia Manipulated Grosdidier's Duties to Disadvantage Her in the Selection Process

Grosdidier contends that after Dia learned that he would permitted to fill the GS-13 position, he took deliberate steps to disadvantage Grosdidier and advantage Donangmaye for the position.  Specifically, Grosdidier claims that Dia removed her from regular editing duties shortly after he learned that he would be filling the GS-13 Senior Editor position.  Although Defendant argues that editing assignments were made on an as-needed basis, there is evidentiary support for Grosdidier's claim, since it appears that she stopped receiving editing assignments from Dia in June 2005 and began receiving them in April 2006 after Dia had selected Donangmaye for the position.  However, there is no evidence that the panelists considered this as a factor in determining that Donangmaye was more qualified than Grosdidier.

Grosdidier also contends that Dia disadvantaged her by precluding her from posting content on the French to Africa Service's website.  However, there is no evidence in the record that Dia precluded Grosdidier from working on the internet; Grosdidier admitted that she had assumed she was not supposed to work on the internet based on Dia's memo indicating that

Donangmaye would be responsible for internet content. Nonetheless, the record might support an inference that Dia favored Donangmaye over Grosdidier with respect to the assignment of internet duties, since Dia did not ask for Grosdidier to be assigned internet duties until February 2007.

        c.      Evidence that Dia Structured the Selection Process to Disadvantage Grosdidier

Grosdidier claims that Dia manipulated the vacancy announcement so that the position would be specifically tailored to Donangmaye's resume and disadvantage Grosdidier. The record does indicate that Dia added the duties of webmaster and weekly television host to the position description, duties that were already being performed by Donangmaye. There is also some evidence in the record suggesting that these duties were not essential to the creation of a GS-13 position. This evidence might be construed as showing that Dia was trying to structure the position in a way that would favor Donangmaye. Grosdidier also contends that Dia chose interview panelists who were predisposed to rule in favor of Donangmaye and against Grosdidier. Although there is no clear evidence of bias by the panelists, at least of two of the panelists had worked with Donangmaye and may have been predisposed to select him based on their positive experiences working with him, although they denied any preselection. In addition, the record indicates that Dia had communicated with one of the panelists about one of Grosdidier's complaints about a sexually charged work environment, suggesting that Dia may have influenced that panelist's view of Grosdidier.

        d.      Evidence that the Panelists Mistreated Grosdidier During the Interview Process

Grosdidier contends that the record demonstrates that the panelists treated Grosdidier

differently than the other candidates and disregarded Grosdidier's allegedly superior qualifications. However, there is no evidence that the panelists treated Grosdidier differently than the other candidates; Grosdidier's claim of unfair treatment is unsupported speculation based on what she perceived to be aggressive questioning from the panel. Grosdidier also claims that the panelists disregarded her superior qualifications as an editor, a critical skill for the Senior Editor position. However, the record does not establish that Grosdidier had significantly better qualifications as an editor than Donangmaye. Both Grosdidier and Donangmaye had many years of experience editing and had been assigned editing duties by Dia on a rotational basis; the fact that Grosdidier had more years of experience in total and provided more detailed written application materials does not mean that she was more qualified for the position. Furthermore, the record shows that Grosdidier was less qualified than Donangmaye regarding internet skills because he was already trained to edit the VOA website and had been editing content on the webiste for nearly a year prior to the interview. Grosdidier complains about the fact that the panel apparently focused more on her interview than her written qualifications, but that does not suggest that the panel was biased against her. Grosdidier's complaints about the manner in which the panelists evaluated her qualifications do not give rise to any inference of discrimination by the panel. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.").

Grosdidier also contends that the panelists gave contradicting accounts of the selection process and that this suggests they were covering up their bias against her. However, the "contradictions" claimed by Grosdidier are exaggerated and largely based on the panelists' inability to remember the details of their deliberations. The fact that the panelists disagree about whether supervisory experience or familiarity with the internet were important factors in the decision does not suggest a cover-up; it mostly suggests that each panelist had different concerns about what factors were most important for the position. Grosdidier has not established that any of these factors were improperly considered or that she was obviously the most qualified candidate based on these factors.

Grosdidier argues that the numerical scores assigned by the panel were arbitrary and that this supports a finding that the panel was biased against Grosdidier. The record does indicate that the panelists initially selected Donangmaye as their top choice before being informed by Dia of the need to assign scores to the candidates. Furthermore, the lack of a formal rating or assessment process does suggest that the scores were somewhat arbitrary. However, this does not call into question the validity of the panel's judgment that Donangmaye was the most qualified candidate, followed by Jaafar, followed by Grosdidier. Again, Grosdidier's complaints focus on the panel's evaluation of her qualifications, which were not clearly superior to both Donangmaye and Jaafar. The record shows that Jaafar had similar educational qualifications as Grosdidier and over two decades of experience as a broadcast journalist, mostly with the VOA. Grosdidier argues that Jaafar's experience should be discounted because he worked in Arabic, but the record shows that he was fluent in French and had experience translating French into Arabic. The panel could have reasonably decided that he was more qualified than Grosdidier.

        e.      Evidence that the Panelists Believed Grosdidier Had an "Axe to Grind"

Grosdidier argues that the record shows that the panelists believed Grosdidier had an axe to grind with the agency and this was the reason she was not selected for the promotion. Indeed, there is evidence in the record suggesting that the panelists were concerned that Grosdidier's views might clash with agency management and that this was one factor that the panelists weighed against Grosdidier's candidacy. Although friction with management may be a legitimate reason for choosing not to promote an employee, a reasonable jury might conclude, drawing all inferences in favor of Grosdidier, that the panel's concerns were motivated by Grosdidier's prior complaints a sexually charged work environment. Therefore, to the extent Grosdidier's complaints amounted to statutorily protected activity, a jury might conclude that retaliation played a role in the panel's decisions.

        f.      Evidence that the Panelists Destroyed Documents Relating to Selection; Motion for Adverse Presumption

Grosdidier contends that the record clearly shows that two of the panelists destroyed documents relating to the selection process, and therefore the Court should presume that these documents would have demonstrated that the panelists did not judge her on the merits but instead discriminated and retaliated against her. Grosdidier has filed a [23] Motion for Adverse Presumption in which she asks the Court to enter an adverse inference against Defendant, namely that all of the evidence that was destroyed would be favorable to Grosdidier and unfavorable to Defendant. "A sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so." *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995). "In general, the destruction of notes or other documents

purportedly relevant to a case of discrimination has no effect except when the circumstances of destruction provide a basis for attributing bad faith to the agency involved." *More v. Snow*, 480 F. Supp. 2d 257, 274 (D.D.C. 2007) (quotation marks and citations omitted).

Defendant does not dispute that Sandra Lemaire and Andre de Nesnera discarded their notes regarding the selection process because they did not think they needed to keep them. *See* Pl.'s Ex. 13 (BBG Discovery Responses) ¶ 12. *But see* Def.'s Ex. EE (Lemaire Aff.) at 44 (indicating that Lemaire did not take any notes). Grosdidier contends that this destruction violated 29 C.F.R. § 1602.14, which provides in pertinent part that "[a]ny personnel or employment record made or kept by an employer (including but not necessarily limited to . . . records having to do with . . . promotion . . . ) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later." The EEOC has construed this regulation to apply to the preservation of interview notes. *See Clayton v. Potter*, EEOC Appeal No. 0720070042, 2007 WL 2228870 (E.E.O.C. July 26, 2007). Grosdidier also argues that the destruction of interview notes violated internal agency rules requiring that the entire case file, including documentation supporting the personnel action, be transmitted to the VOA's personnel department. *See* Pl.'s Mot. for Adverse Presumption, Ex. 2 ("Guidelines for Selection, Promotion, and Employment of Non-U.S. Citizens in the Presence of Qualified U.S. Citizen Competitors.") at 2. However, these guidelines do not explicitly state that interview notes must be kept as part of the case file, and there is no evidence in the record that either Lemaire or de Nesnera was aware of these guidelines. Therefore, although Lemaire and de Nesnera may have been negligent if they discarded their interview notes, there is insufficient evidence in the record to support a finding of bad faith. Accordingly, the Court shall

deny Grosdidier's Motion for Adverse Presumption. However, as Grosdidier acknowledges in her motion, *see* Pl.'s Mot. for Adverse Presumption at 12 n.6, the Court must evaluate the record in the light most favorable to Grosdidier when considering Defendant's motion for summary judgment, and therefore she is already entitled to all reasonable inferences that can be drawn from the record. Even where an adverse inference is not warranted due to a lack of bad faith, the failure to follow a regulation requiring the preservation of evidence may be deemed by the finder of fact to be probative of the true motivation behind the employment decision. *See Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) ("[A] failure on the part of the . . . employer to follow its own regulations and procedures, alone, may not be sufficient to support a finding of . . . discrimination[, but] the adherence to or departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true motivation behind the hiring decision . . . ."); *McIntyre v. Peters*, 460 F. Supp. 2d 125, 138 (D.D.C. 2006) ("[D]efendant's failure to follow its own policy requiring the retention of employment decision documents, when viewed in light of plaintiff's other evidence of pretext, raises a credibility question that is properly left to the jury.") (citations omitted).

The inference that may be reasonably drawn from the destruction of interview notes in this case is limited. The Court cannot presume that the notes destroyed would have contained direct evidence of discrimination by the panelists against Grosdidier, for it is exceedingly unlikely that the panelists would have written down any discriminatory thoughts for the record. *Cf. United Food & Commercial Workers Int'l Union v. NLRB*, 998 F.2d 7, 1993 WL 264414, at *2 (D.C. Cir. 1993) (table) ("It is the rare case where direct evidence of unlawful motivation, such as the smoking gun documents, exists, and unlawful motivation is therefore usually inferred

from the employer's conduct."). However, it is reasonable to assume that the notes would corroborate the other evidence in the record suggesting that the panelists relied on a variety of factors and did not follow rigid criteria in rating the candidates. The Court may also presume that the notes would corroborate the inconsistent testimony given by the panelists about what factors were discussed or considered to be significant in choosing Donangmaye as the top candidate. This evidence suggests that the panelists' evaluation was somewhat subjective, which the Court may consider in evaluating whether the selection was truly merit-based. *See Fischbach*, 86 F.3d at 1184 (noting that reliance on "highly subjective" criteria may support an inference of discrimination). However, "[e]ven if a court suspects that a job applicant was victimized by poor selection procedures it may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Id.* at 1183 (internal quotation marks, alterations, and citations omitted).

> g.     Evidence that Dia Misrepresented Grosdidier's Qualifications to His Superiors and Did Not Comply with Policies Regarding the Promotion of Non-Citizens

Grosdidier claims that Dia misrepresented her qualifications to her supervisors in seeking to justify the hiring of Donangmaye over herself and Jaafar. For example, she points to the fact that Dia's memorandum to his supervisor ignored Grosdidier's superior editing qualifications. As discussed above, however, Dia's evaluation of Grosdidier's qualifications is not inherently suspect. Grosdidier also contends that Dia misrepresented to the Chief of the Operations Division that she had not taken the CommonSpot training courses necessary to edit the website. However, the record shows that Dia's memorandum was written on March 22, 2006, one day before Grosdidier completed her training; therefore, it was not a misrepresentation.

Grosdidier also argues that the agency violated its own policies regarding the hiring of noncitizens by selecting Donangmaye for the position. Grosdidier's argument is based on BBG policy implementing 22 U.S.C. § 1474(1), which authorizes the agency to "employ . . . aliens within the United States and abroad for service in the United States relating to . . . the production of foreign language programs when suitably qualified United States citizens are not available when job vacancies occur . . . ." As one other court in this district has held, "[n]othing in 22 U.S.C. § 1474 supports the broad argument that the BBG lacks authority to promote non-citizens to supervisory positions." *Nyunt v. Tomlinson*, 543 F. Supp. 2d at 43 n.3 (quotation marks omitted). However, Section 822.1 of the agency's personnel manual states that "[a] non-U.S. citizen may be employed or promoted only if no equally or better qualified U.S. citizen is available to perform the duties of the position." *See* Pl.'s Ex. 49. Grosdidier argues that the agency violated this provision because she was equally or better qualified for the job. However, the agency made the determination that she was not equally qualified as Donangmaye, and, as explained above, the Court cannot second-guess the agency's employment decision where it is objectively reasonable based on the record. Grosdidier also argues that the agency violated Section 822.1(c), which provides that "non-U.S. citizens will not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making," except where agency officials determine that "the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but also is having an adverse impact on Broadcasting's mission." *Id.* However, there is no evidence that the panelists were aware of this policy, and even assuming the agency did violate it, the violation does not suggest that its

reasons for selecting Donangmaye over Grosdidier were a pretext for discrimination.

> h.    Summary of Grosdidier's Evidence

Construing the evidence cited by Grosdidier in the light most favorable to her, a reasonable jury might conclude that Dia structured the vacant position in a way that favored Donangmaye over Grosdidier. However, no reasonable jury could conclude that Dia did so in order to discriminate based on Grosdidier's race, sex, or national origin. The only evidence of discrimination based on race, sex, or national origin that Grosdidier has proffered is the fact that Donangmaye is black, male, and of Chadian national origin, whereas Grosdidier is white, female, and of French national origin. In a workplace as diverse as the VOA, no reasonable jury could infer discrimination based on this fact alone.

The record demonstrates that the panel chosen by Dia recommended Donangmaye and Jaafar over Grosdidier based on a comparison of the candidates' qualifications and performance during their interviews. Although Grosdidier claims that the panelists improperly destroyed their notes from the interviews and treated Grosdidier unfairly during the interview process, her claims are mostly speculative and unsupported by the record, and they do not credibly undermine Defendant's explanation that Donangmaye was chosen for merit-based reasons. Grosdidier has not shown that she was significantly more qualified than Donangmaye such that a reasonable jury could conclude that the panel's decision was a pretext for discrimination. At most, the record suggests that the panelists used subjective factors to select Donangmaye as their favored candidate. However, this evidence is not very probative of the panel's rationale. When considered together with Grosdidier's prima facie case—which is based only on the fact that Donangmaye has a different race, sex, and national origin—Grosdidier does not have enough

evidence to enable a reasonable jury to conclude that she was discriminated against on the basis of sex, race, or national origin. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000) ("Whether judgment as a matter of law is appropriate in any particular case will depend on . . . the strength of the plaintiff's prima facie case, the probative value of the proof of the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."). Therefore, the Court shall grant Defendant's motion for summary judgment as to Grosdidier's claims that the agency discriminated against her based on her race, sex, or national origin by not selecting her for a promotion.

However, there is some evidence in the record that the panelists deemed Grosdidier less qualified in part because they thought she had an axe to grind with the agency, and the panelists may have reached this conclusion based on their prior interactions with Dia. Therefore, in context, a reasonable jury drawing all inferences in favor of Grosdidier might conclude that the selection process was influenced by retaliatory animus. However, as explained below, retaliation is only actionable under Title VII if the conduct giving rise to the retaliation—in this case, Grosdidier's complaints about a sexually charged work environment—qualifies as protected activity under the statute. Therefore, the Court must determine whether Grosdidier's complaints about her workplace in 2004 and 2005 are protected activity.

### 3. Protected Activity Under Title VII's Opposition Clause

Title VII's antiretaliation provision protects two kinds of activity: (1) participation in EEO proceedings, such as making a charge, testifying, assisting, or otherwise participating in an EEO investigation, proceeding, or hearing; and (2) opposition to "any practice made an unlawful

employment practice" by Title VII. *See* 42 U.S.C. § 2000e-3(a). The D.C. Circuit has held that "an employee seeking the protection of the opposition clause [must] demonstrate a good faith, reasonable belief that the challenged practice violates Title VII." *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (quoting *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981)).

The activities at issue in this case are the complaints Grosdidier made in 2004 and 2005 about sexually charged conduct in her workplace.[6] Grosdidier's complaints are only protected against retaliation if Grosdidier had a good faith, reasonable belief that her workplace was so sexually charged that it amounted to a hostile work environment. A hostile work environment is actionable under Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) (citations omitted) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). In determining whether a work environment is hostile or abusive, courts examine all the circumstances, including the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether there is unreasonable interference with an employee's work performance. *Id.* at 23. In order to be actionable under the statute, a work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The

_____

[6] Although Grosdidier engaged in protected activity in 2002 and earlier, this occurred before Dia became her supervisor and is too remote in time for a reasonable jury to infer a causal connected to her nonselection for the GS-13 position in March 2006.

43

"standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* (quoting *Oncale*, 523 U.S. at 80).

Although it appears that Grosdidier had a good faith basis for opposing what she perceived to be offensive conduct in the workplace, no reasonable employee could believe that the conduct about which she complained amounted to a hostile work environment under Title VII. The conduct about which Grosdidier complained consisted of: two emails sent by a coworker that Grosdidier interpreted as sexually suggestive but which are also susceptible to innocent interpretations; the use of the phrases "Sexy Papa" and "Sexy Mama" by Dia and a female coworker; excessive hugging and kissing by other coworkers during greetings; the use of the term "maitre" or "master" by a female employee to address Dia; and one instance involving a male coworker's inappropriate decision to wear shorts at the office. These incidents are neither frequent enough nor severe enough to meet the standard for a hostile work environment under Title VII, which "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81. The incidents about which Grosdidier complained were not directed at her, nor were most of them objectively offensive. And there is no evidence to suggest that these incidents had a material impact on Grosdidier's job performance. Accordingly, her complaints to Dia about them do not qualify as protected activity for purposes of Title VII's antiretaliation provision. Therefore, the Court shall grant Defendant's motion for summary judgment as to Grosdidier's claim that the agency retaliated against her by not selecting her for a promotion.

C.     *Grosdidier's Hostile Work Environment Claim*

In her Complaint, Grosdidier alleges that Defendant's ongoing conduct against her

constituted a hostile work environment that is based on her age, race, sex, national origin, and her prior exercise of protected activity. As the Court noted above, however, Grosdidier failed to exhaust her claims based on age or race discrimination, and her hostile work environment claim must be limited to allegations that are like or reasonably related to the four actions she described in her administrative complaint: (1) the failure to update Grosdidier's position description; (2) the reduction in Grosdidier's responsibilities; (3) the cessation of direct interaction from Grosdidier's supervisor; and (4) her letter of admonition.

There are two reasons why Grosdidier's claim for hostile work environment fails. First, there is not evidence for a reasonable jury to conclude that the alleged actions are connected to either her sex, her national origin, or her prior protected EEO activity. "Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009); *see id.* (citing cases). The only workplace conduct that could possibly relate to Grosdidier's sex are the actions about which she complained in 2004 and 2005—the alleged excessive hugging and kissing and inappropriate use of terms such as "master" or "Sexy Papa." As the Court explained above, however, this conduct was neither objectively offensive nor directed at Grosdidier, and it is not severe or pervasive enough to amount to a hostile work environment. Grosdidier also claims that Defendant created a hostile atmosphere by telling her coworkers that she was the one who had complained about a sexually charged atmosphere, resulting in retaliation from her coworkers. However, as the Court explained above, Grosdidier's complaints about the sexually charged atmosphere did not

constitute protected activity, and therefore any hostile work environment based on such retaliation is not actionable under Title VII.

Grosdidier does cite to some evidence that could connect the allegedly hostile activity to the filing of her July 2006 EEO Complaint. *See* Pl.'s Opp'n at 40 (citing Pl.'s Ex. 33 (Aff. of Samuel Kiendrebeogo)). In an affidavit, Samuel Kiendrebeogo describes an environment in which coworkers are afraid to interact with Grosdidier shortly after she filed her complaint. *See* Pl.'s Ex. 33 (Aff. of Samuel Kiendrebeogo) at 3. Kiendrebeogo's allegations are somewhat vague, and the second page of his affidavit is missing from the record, but it appears that the hostility he describes pertains to other co-workers' treatment of Grosdidier following the filing of her complaint. *See id.* However, Grosdidier did not complain about alienation from her coworkers in her administrative complaint, and this allegation is not "like or reasonably related" to the incidents Grosdidier described in her administrative complaint. Therefore, Grosdidier did not exhaust a hostile work environment claim based on this conduct.

The second reason that Grosdidier's hostile work environment claim fails is that she has not presented evidence sufficient for a reasonable jury to conclude that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 65, 67). However, the predicate acts on which her hostile work environment claim rests are not severe or pervasive enough to suggest that Grosdidier suffered an abusive working environment. Grosdidier alleges that at some point, Dia stopped interacting with her directly and communicated to her exclusively through other staff members. *See* Compl. ¶ 28. Grosdidier has

not cited to any evidence in support of this allegation in her statement of material facts, but in any event, this manner of communication does not qualify as the sort of extreme conduct that is required to support a hostile work environment claim. *See Faragher*, 524 U.S. at 788 ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."). Similarly, the letter of admonition Grosdidier received in April 2008 for turning off a shared printer does not constitute severe conduct that suggests an abusive work environment; the language of the letter is not objectively offensive, and Grosdidier does not deny that she turned off the printer. The claim that Defendant failed to update Grosdidier's position description also does not support her hostile work environment claim, as it is not the sort of conduct that an employee would find objectively offensive. Moreover, Grosdidier's claim regarding her position description is not supported by the record. Grosdidier also complains about things such as poor treatment during staff meetings, but her statement of material facts does not cite to any record evidence supporting a claim of persistently poor treatment.

To the extent that Grosdidier relies on discrete adverse actions by her supervisor reducing her work responsibilities, she misunderstands the nature of a hostile work environment claim. "A hostile work environment under Title VII must be based on 'one unlawful employment practice' of pervasive, insulting, discriminatory conduct that makes the plaintiff's day-to-day work environment severely 'abusive.'" *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) (quoting *Morgan*, 536 U.S. at 117). "Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim . . . .'" *Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (quoting *Lester v. Natsios*, 290 F. Supp.

2d 11, 33 (D.D.C. 2003)).  This concern is particularly acute where the plaintiff has failed to

exhaust administrative remedies with respect many of the discrimination claims that she seeks to

incorporate into a hostile work environment claim.  *Rattigan*, 503 F. Supp. 2d at 82; *accord*

*Patterson v. Johnson*, 391 F. Supp. 2d 140, 148 (D.D.C. 2005) ("[P]laintiff cannot cure his

failure to timely exhaust his complaints about [discriminatory] incidents by sweeping them under

the rubric of a hostile work environment claim."), *aff'd*, 505 F.3d 1296 (D.C. Cir. 2007).  In this

case, Grosdidier complains about her removal as a host of "Washington Forum" in the fall of

2006 and reductions in her editing responsibilities beginning in February 2007.  These are

discrete acts that are distinct from a hostile work environment.  *See Morgan*, 536 U.S. at 114

("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are

easy to identify.  Each incident of discrimination and each retaliatory adverse employment

decision constitutes a separate actionable 'unlawful employment practice.'").  Therefore, they do

not support Grosdidier's hostile work environment claim.

Grosdidier also cites additional evidence in her opposition brief that is not contained in

her statement of material facts in support of her hostile work environment claim.  *See* Pl.'s Opp'n

at 42-43.[7]  This evidence allegedly shows that Grosdidier's supervisors collected examples of

mistakes that Grosdidier made on the job, denied her request in July 2006 to work the night shift

for two weeks, subjected her to a security investigation in May 2007, and screamed at her during

a meeting.  However, these incidents are not frequent or severe enough to amount to a hostile

---

[7] In addition to not being included in Grosdidier's statement of material facts, much of the
evidence cited by Grosdidier is not actually in the record.  For example, Grosdidier cites to pages
70, 82, 128-29, and 116 of her deposition transcript (Pl.'s Ex. 2), but those pages are part of a
confidential portion of the transcript that was not provided to the Court.  *See* Pl.'s Opp'n at 42.

work environment. Furthermore, courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors. *See, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (finding that actions such as exclusion from the informal chain of command, close monitoring of work, missed opportunities for teaching, travel, and high-profile assignments, and reassignment to another unit did not amount to a hostile work environment because "they cannot fairly be labeled abusive or offensive"); *see also Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignment or modified job functions and of [supervisor's] unprofessional and offensive treatment are not sufficient to establish that [plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult.") (citation and quotation marks omitted), *aff'd*, 2011 WL 318401 (D.C. Cir. Jan. 31, 2011).

Based on the frequency, severity, and pervasiveness of the conduct that Grosdidier has established in the record, the Court finds that no reasonable jury could conclude that Grosdidier suffered harassment that altered the conditions of her employment and created an abusive working environment. Therefore, the Court shall grant Defendant's motion for summary judgment with respect to Grosdidier's claim for hostile work environment.

D.      *Grosdidier's Other Discrete Claims of Discrimination and Retaliation*

In her Complaint, Grosdidier purports to assert causes of action for discrimination based on race, sex, and national origin and retaliation with respect to various discrete actions: (1) the

reduction in her editing duties and other responsibilities, including removal as substitute host of

"Washington Forum"; (2) the failure to update her job description to reflect the duties of

International Broadcaster; (3) her supervisor's cessation of direct interaction with her; and (4) the

letter of admonition issued to her in March 2008.[8]  As noted above, Grosdidier failed to exhaust

many of these claims.  Defendant also argues in its motion for summary judgment that none of

these actions amount to adverse employment actions that are actionable under Title VII.  *See*

Def.'s Mem. at 33-38.  Grosdidier does not argue in her opposition brief that these actions can

provide the basis for a discrimination claim under Title VII, and therefore the Court shall treat

Defendant's argument as conceded as to any claims for discrimination based on race, sex, or

national origin arising from these actions.  *See Hopkins v. Women's Div., Gen. Bd. of Global*

*Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when

a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised

by the defendant, a court may treat those arguments that the plaintiff failed to address as

conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004).  Grosdidier does not concede, however, that

these actions could not support discrete claims of retaliation under Title VII.  Therefore, the

Court must determine whether Grosdidier has produced enough evidence for a jury to conclude

that these actions constituted retaliation actionable under Title VII.

Title VII retaliation claims are assessed pursuant to a burden-shifting framework initially

---

[8] In her opposition brief, Grosdidier argues that additional actions taken by Defendant may amount to retaliation.  *See* Pl.'s Opp'n at 44.  However, "[i]t is well-established in this district that a plaintiff cannot amend h[er] Complaint in an opposition to a defendant's motion for summary judgment."  *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008).  In addition, Grosdidier did not exhaust any claims beyond the four identified above.  Therefore, the Court shall not consider these additional actions as stand-alone retaliation claims.

set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03

(1973).  As the D.C. Circuit has explained:

> Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions.  If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all of the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citations and quotations omitted).  To

establish that an action is materially adverse, a "plaintiff must show that the employment action

produced an injury or harm that might well dissuade a reasonable worker from making or

supporting a charge of discrimination."  *Sewell v. Chao*, 532 F. Supp. 2d 136 (D.D.C. 2008)

(citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), *aff'd sub nom. Sewell*

*v. Hugler*, 2009 WL 585660 (D.C. Cir. 2009).

### 1.    Claim Based on Cessation of Interaction with Supervisor

Grosdidier contends that Dia retaliated against her by refusing to interact with her

directly, using Grosdidier's coworkers as intermediaries to communicate with her.  However, as

the Court noted above, Grosdidier has only produced evidence of a single incident where this

occurred.  Based on this evidence, the Court finds that it may grant Defendant's motion for

summary judgment on the ground that this lack of direct interaction does not amount to an

adverse employment action under Title VII.  No reasonable employee would be dissuaded from

filing a discrimination complaint as a result of a supervisor's decision to communicate indirectly

through a coworker. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68. Accordingly, the Court shall grant Defendant's motion for summary judgment as to this alleged action.

### 2. Claim Based on Failure to Update Job Description

Grosdidier claims that in November 2007, her supervisor failed to update her position description, making her potentially vulnerable to a reduction in force. However, Grosdidier has not cited to any record evidence in support of this claim apart from her own deposition testimony explaining that her position description has remained unchanged. The uncontroverted evidence in the record establishes that Dia did submit an updated position description for Grosdidier to the agency's human resources department. Furthermore, there is no evidence in the record that Grosdidier was actually harmed by the failure to update her position description, and no reasonable employee would be deterred from engaging in protected activity by such inaction. Accordingly, the Court shall grant Defendant's motion for summary judgment with respect to this claim.

### 3. Claim Based on Letter of Admonition

Grosdidier contends that the letter of admonition she received on April 1, 2008 amounts to retaliation under Title VII. However, letters of admonition or reprimand generally do not qualify as materially adverse actions when they do not contain offensive language and there is no evidence that the letter will result in any adverse consequences to the admonished employee. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); *Herbert v. Architect of the Capitol*, ___ F. Supp. 2d ___, Civil Action No. 07-1516, 2011 WL 637549, at *12 (D.D.C.

Feb. 23, 2011).  The letter about which Grosdidier complains is not demeaning, there is no evidence that it caused her any actual harm, and she does not dispute that she committed the conduct for which she was being admonished.  Therefore, the Court finds that no reasonable jury could conclude that the letter of admonition was a materially adverse action.

### 4.    Claim Based on Reduction of Duties

Grosdidier's final claim is that she suffered retaliation by having her editing duties reduced or eliminated on an ongoing basis after Dia was deposed in her EEOC litigation.  As the Court explained above, Grosdidier exhausted this claim only to the extent that Dia continued to assign her to non-editing duties on a weekly basis after October 5, 2007.  The parties did not directly address this formulation of Grosdidier's claim in their briefs, and the Court is reluctant to comb the record in order to assess the merits *vel non* of this claim.  There is some evidence in the record to support Grosdidier's claim that she was not assigned editing responsibilities during this period, and there is also general evidence in the record that Dia, who made the assignments, was upset at Grosdidier for questioning his commitment to a discrimination-free workplace.

Defendant argues that any reduction in Grosdidier's editing duties cannot constitute a materially adverse action because her work assignments varied based on the dynamic needs of her workplace.  In support of this argument, Defendant relies on an affidavit from Dia in which he explained that Grosdidier was assigned editing duties on an ad hoc basis.  However, Grosdidier has produced evidence suggesting that she was one of the few GS-12 broadcasters who was ever assigned responsibility for editing the work of other broadcasters, and the pattern of periods in which Grosdidier was or was not assigned such duties undermines the testimony of Dia and Ferdinand Ferella that her responsibilities never changed.  Considering that all of the

supervisory positions in Grosdidier's workplace involve more significant editing duties, a reasonable jury might conclude that a retaliatory denial of editing duty would dissuade a reasonable employee from engaging in protected activity. *See Burlington*, 548 U.S. at 70-71 (explaining that in context, reassignment of job duties within an employee's job description may constitute actionable retaliation); *Edwards v. U.S. Envtl. Prot. Agency*, 456 F. Supp. 2d 72, 87 (D.D.C. 2006) ("In the wake of [*Burlington Northern & Santa Fe Railway Co. v.*] *White*, this Court has similarly concluded that a plaintiff's allegation that she has been stripped of some of her duties sufficed to establish an adverse employment action in the retaliation context."). Accordingly, the Court shall deny Defendant's motion for summary judgment with respect to Grosdidier's claim that she suffered retaliation when she was not assigned editing duties after October 5, 2007.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Grosdidier failed to exhaust her claims of age discrimination, claims based on discrete actions that occurred before October 5, 2007, and her hostile work environment claim to the extent it relies on conduct that is not like or reasonably related to the allegations raised in her administrative complaint. The Court finds that Grosdidier has failed to produce evidence sufficient to allow a reasonable jury to conclude that her nonselection for a GS-13 position in 2006 was motivated by discrimination based on sex, race, national origin, or Grosdidier's prior exercise of protected activity. The Court further finds that no reasonable jury could conclude that the adverse actions Grosdidier suffered amounted to a hostile work environment actionable under Title VII. With respect to claims based on other discrete actions taken by her employer, the Court finds that Grosdidier has produced evidence

sufficient to survive summary judgment on only one claim, that her editing responsibilities were reduced after October 5, 2007 in alleged retaliation for her prior protected activity. Therefore, the Court shall DENY Defendant's [15] Motion for Summary Judgment with respect to Grosdidier's claim that Defendant retaliated against her by reducing her editing responsibilities after October 5, 2007 and GRANT Defendant's motion in all other respects. The Court shall also DENY Plaintiff's [23] Motion for Adverse Presumption. An appropriate Order accompanies this Memorandum Opinion.


Dated: March 28, 2011 _____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge